EFLAND HOSIERY MILLS v. WALKER D. HINES, DIRECTOR GENERAL
OF RAILROADS.

(Filed 8 November, 1922.)

**Refusal of Shipment—Carriers of Goods—Railroads—Commerce—Bills
of Lading—Order, Notify—Interstate Commerce—Storage—Options
—Negligence—Public Warehouses.**

By accepting a bill of lading from the initial carrier of an interstate
shipment of goods, approved by the Interstate Commerce Commission
under the authority of Congress, the consignor becomes bound by its
terms; and where, upon an interstate shipment "to order notify," the
person to be notified has refused it, and the consignor has been duly noti-
fied, the exercise of the option given in the bill of lading to store the goods
in a public warehouse without liability, releases the railroad from all
liability, either as a common carrier or warehouseman, and the destruc-
tion by fire of the goods while thus stored cannot be considered as its
negligence, or permit recovery against the initial carrier, in the line of
transportation, under the Carmack (now Cummins) Amendment.

APPEAL by defendant from *Kerr, J.,* at May Term, 1922, of ORANGE.

The plaintiff alleges that it delivered to the defendant, at Efland,
N. C., in October and November, 1918, five consignments of hosiery for
transportation to Lykens, Pa. That the shipments were consigned to
plaintiff, "order notify Enterprise Hosiery Mills, Lykens, Pa.," which
is on the Pennsylvania Railroad, and that uniform "order notify"
through bills of lading were issued covering said shipments. The goods
arrived at their destination, and the Enterprise Hosiery Mills was
notified and refused to accept the same; the goods were thereafter placed
in storage with Leeds Storage Warehouse, at Williamsport, Pennsyl-
vania, and plaintiff notified that the goods were placed in storage.

The plaintiff, on or about 1 March, 1919, sent to the agent of Penn-
sylvania Railroad Company, at Williamsport, Pa., the original "order
notify" bills of lading, with instructions to reship said goods to Eliza-
bethville, Pa. That the goods were not reshipped in accordance with
these instructions until 10 March, 1919, and that in the meantime, and
on 6 March, they were damaged by fire which occurred at the ware-
house.

The defendant answered and admitted the shipment of the goods, the
refusal of the Enterprise Hosiery Mills to receive the same, the giving
of notice of nondelivery to plaintiff, the placing of the goods in a public
storage warehouse, and notice to plaintiff of the same.

The defendant pleaded the contracts of shipment as evidenced by the
bills of lading, and alleged that he had completed his contracts of ship-
ment by transporting the goods to the point of destination, delivering
the same there, notifying Enterprise Hosiery Mills, and also notifying

plaintiff, and thereafter placing said goods in a public storage warehouse, in accordance with said contracts, and denied any liability on account of the alleged damage by fire at the warehouse, or alleged negligence on account of any alleged delay in reshipping said goods after surrender of the bills of lading by plaintiff to the terminal carrier and giving reshipping instructions to said terminal carrier and said warehouse company.

There was a verdict for the plaintiff and judgment thereon, from which the defendant appealed.

*Gattis & Gattis for plaintiff.*
*Parker & Long for defendant.*

WALKER, J. The alleged cause of action arose during the period in which the railroads were operated by the United States Government, under the Director General, and this action is brought against the Director General of Railroads, operating Southern Railroad lines as the initial carrier. The plaintiff is seeking to hold the initial carrier liable for its alleged damages under the provisions of the Federal law known as the Carmack (now Cummins) Amendment.

The defendant's second exception is to the refusal of the trial judge to dismiss this action as of nonsuit at the conclusion of the plaintiff's evidence. His third exception is to the refusal of the trial judge to dismiss this action as of nonsuit at the conclusion of all the evidence.

Considering first these two exceptions, the facts in this case, as to the real question involved, are practically undisputed. The pleadings and all of the evidence show that the several shipments of goods were made by the plaintiff at Efland, N. C., consigned to itself at Lykens, Pa., "order notify Enterprise Hosiery Mills, Lykens, Pa." That said shipments were interstate, and that "order notify bills of lading" were issued covering each of the shipments, and that all the goods were delivered at Lykens, Pa., and the Enterprise Hosiery Mills promptly notified of the arrival, and that it refused to receive or accept the goods, and it was further notified that unless the goods were removed within thirty days same would be placed in public storage. That thereupon the plaintiff was notified that the Enterprise Hosiery Mills had refused to accept the goods, and that the same were being placed in public storage as refused goods. That after the goods were held at Lykens, Pa., for thirty days, they were forwarded to Williamsport, Pa., and placed in a public storage warehouse, and plaintiff was notified that the goods were in storage and that he would have to pay freight and storage charges and surrender the original "order notify bills of lading" before the goods would be released. That plaintiff first placed the bills of lading with the agent of defendant

at Efland, N. C., and was later requested by the agent of the Pennsylvania Railroad at Williamsport to forward bills of lading to that office, which was done, the said bills being received by the agent at Williamsport on 1 March, 1919.

It appears that the contracts entered into by the defendant, operating the Southern Railway lines, as the initial carrier, and the plaintiff, as evidenced by the five bills of lading, were fully complied with by the defendant and his connecting carriers, in that all of the goods were delivered at Lykens, Pa., notice duly given of their arrival, and that they were refused by the plaintiff, and thereafter placed in public storage in full conformity with the said contracts of carriage or bills of lading.

Section 5 of the several bills of lading was specifically pleaded, and the bills of lading introduced in evidence, section 5 being as follows: "Sec. 5. Property not removed by the party entitled to receive it within 48 hours (exclusive of legal holidays) after notice of its arrival has been duly sent or given may be kept in car, depot, or place of delivery of the carrier or warehouse, subject to reasonable charge for storage and to carrier's responsibility *as warehouseman only,* or may be, at the option of the carrier, removed to and stored in a public or licensed warehouse, at the cost of the owner, and there held at the owner's risk and without liability on the part of the carrier and subject to a lien for all freight and other lawful charges, including a reasonable charge for storage."

In the case of *Booth v. N. Y. Central Railway Co.,* where an interstate shipment of box shooks were placed in a public storage warehouse, the Supreme Court of Vermont, in construing that part of the bill of lading quoted above, says: "By the terms of the contract, if the shooks were not removed by the party entitled to receive them within the time specified, two courses were open to the defendant; the shooks could be kept in the place named in the bill of lading, subject to responsibility as warehouseman only; or they could be removed to and stored in a public or licensed warehouse, in which case they would be held without liability on the part of the defendant." *Booth v. N. Y. C. R. Co.,* Atlantic Reporter, vol. 112, pp. 894-896.

There can be no reasonable contention, upon the material facts of this case, that the duty of the defendant as carrier and warehouseman had not terminated. The duty as carrier ended certainly at the expiration of 48 hours after the arrival of the goods at their destination and notice was given of their arrival. If the terminal carrier had retained the goods in its possession, then, according to the earlier authorities, it would have been liable as warehouseman only, but the defendant, as the initial carrier, would not be liable as warehouseman, for it was said in

those cases: "Where the liability of a connecting carrier as such has ceased, and it has assumed the status of a warehouseman, the amendment (the Carmack Amendment) does not make the initial carrier liable for any subsequent loss or damage to goods so held." Note: Ann. Cas. 1915 B, p. 85, citing *Milling Co. v. R. R.*, 91 Kansas, 783; *R. R. Co. v. Milling Co.*, 63 S. E., 415.

The terminal carrier, in accordance with the contracts of carriage, after the goods were refused, and after they were held for a period of 30 days, removed the same to and stored them in a public warehouse, where, under the bills of lading constituting the contracts of carriage, they were held at the owner's risk and without liability on the part of the carrier. It is said in R. C. L., p. 763, sec. 229: "So long as a carrier has the custody of the goods, although there has been a constructive delivery which exempts him from liability as a carrier, there supervenes upon the original carriage contract, by implication of law, a duty, as bailee or warehouseman, to take ordinary care of the property. But while in no case is the carrier justified in abandoning the goods, or in negligently exposing them to injury, it seems generally to be recognized by the authorities that the law enables him to terminate the relation and so exempt himself from responsibility, by giving him the right to warehouse the goods" (as stipulated in the contracts, that is, to place them in a public warehouse, when he is released from further liability for the same). This is a most just and reasonable provision, because the consignee has refused to take the goods, and they are, therefore, left in the possession of defendant by no fault of his. The plaintiff, or consignor, knew what the consequences would be, as he accepted the bills of lading, and thereby assented to the contracts of carriage expressed therein, and must be held as bound by their terms. One of the terms is what we have quoted above as to the right of the carrier to store the goods in his own car, warehouse, or place of delivery, subject to his responsibility *as warehouseman*, "or (they) may be, at the option of the carrier, removed to and stored in a public or licensed warehouse, at the cost of the owner, and there held at the owner's risk and without liability on the part of the carrier, and subject to a lien for all freight and other lawful charges, including a reasonable charge for storage." "When that is done," it is further said in 4 R. C. L., *supra*, "he is no longer liable in any respect, and if they are subsequently lost by the negligence of the warehouseman the carrier is not liable."

We may as well pause here to state, in its proper connection, that the "uniform order bills of lading," under which the goods were shipped by the plaintiff over the line of the Southern Railway Company, then in charge of the Director General, was that which was prescribed by the Interstate Commerce Commission, and the conditions and terms under

which the shipments were made, as written therein or thereon, are those accepted, approved, and adopted by said commission, under its power to do so, derived from the acts of Congress, and they are therefore the lawful contracts and valid bills of lading under which the carriage was undertaken by the defendant.

Resuming the discussion of the case where we left off to explain the bills of lading, we may now say that there was some delay on the part of the plaintiff as to the surrender of its bills of lading, as the evidence indicates, but it finally surrendered these bills of lading to the agent of the first carrier in the connecting line, as plaintiff required to be done by its letter of 27 February, 1919. On 1 March, 1919, giving instructions at the same time to the warehouse and to the agent of the Pennsylvania Railroad to ship all of these goods to the Enterprise Hosiery Mills, Elizabethville, Pa.

The plaintiff alleges that the delay of the agent of the Pennsylvania Railroad, or the warehouse, or both, to reship these goods before the fire occurred at the warehouse on 6 March, constitutes actionable negligence of the defendant, as the initial carrier, under the original bills of lading. The defendant says that this is not true, as the obligation of the initial carrier had long since been discharged, and the original shipment of the goods, and the delivery thereof, had been fully completed when the same were placed in public storage, and plaintiff had fully ratified and affirmed said acts, and on his own responsibility had assumed control of the said goods, and had surrendered the original bills of lading, and had instructed the reshipment of said goods from Williamsport, Pa., to Elizabethville, Pa., and if the delay of six days, as alleged, should be actionable negligence which would entitle plaintiff to recover, it was not the actionable negligence of the defendant, or the Southern Railway Company, but that of the Pennsylvania Railroad, or the public warehouse, or both, and plaintiff, for any such default as alleged by him, could have no right of action or cause of action against the defendant or the Southern Railway Company, and this, according to the undisputed facts, is the correct position and must control in this case, as there was no culpable or actionable wrong done by the defendant, or the said railway company, they having been discharged by the very terms of the bills of lading of all liability after compliance with the directions given therein, namely, the carrier, could deliver the goods, at his option, to the public warehouse for the purpose of being stored therein at the owner's risk and cost, and without any further liability of the carrier, subject, however, to a lien for all freight and other lawful charges, including a reasonable charge for storage.

The court misconstrued the terms of the contracts, as stated in the several bills of lading, and consequently misapplied the law to the

material questions involved in the case. It follows, without making more particular reference to them, that the court erred in not applying the law to the facts, as we have already stated it, and as requested by the defendant to do. It was not negligence on the part of the defendant to store the goods in the public warehouse, for this was expressly allowed by the contracts of carriage, and when they were stored the defendant's liability for them was terminated.

The plaintiff contends that the carrier's liability, as such, did not cease when the goods had arrived at their destination, and the consignee duly notified of their arrival and given the full time allowed for the removal of them, but we think this is a clear misapprehension of the authorities upon which it relies in support of the contention. The court merely held that the storage of the goods after they had reached their destination was a part of their transportation, and not that the company's liability after the goods had been stored by it, at the end of the journey, should change the liability of the company from that of warehouseman to that of carrier under the act of Congress, but simply that "transportation" should include storage as warehouseman, with the ordinary liability incident to it, and the cases cited by the plaintiff establish this to be the manifest purpose and intent of the statute, as a careful reading of them will show. 34 St. at Large, 584, ch. 3591; Comp. St., 1913, par. 8563; *Cleveland C. C. & St. Louis R. R. Co. v. Dettleback,* 239 U. S., 588, and *Southern Rwy. Co. v. Prescott,* 240 U. S., 632. It is the duty of the carrier to store the goods, as a part of the "transportation," but his liability is that of warehouseman and not of carrier, as will clearly appear from the construction of the act by the Court in the cases cited.

But the defendant did not store the goods in the public warehouse as a part of the transportation, but under and by virtue of the express stipulation of the bills of lading, authorizing the carrier to do so, not in his own warehouse, as ordinarily done, but in a public warehouse, and this stipulation, which was approved by the Interstate Commerce Commission, providing for immunity from further liability in any respect when the goods are so stored, the courts have held to be valid and binding on the shipper, as we have seen.

There are other serious questions raised by the defendant, but we do not deem it essential to discuss them, as those discussed are quite sufficient to dispose of the appeal.

The court should have granted the defendant's motion to dismiss as of nonsuit, and in failing to do so, as the material facts, which go directly and conclusively to the defendant's liability, clearly negative the same, there was error.

Reversed.